Next we have two cases consolidated for argument. Numbers 23-2535 and 23-2573, Hasson against Fullstory and Schnur against Papa Johns. Stretzel? James Schnetzel May it please the court, I'm James Schnetzel for the appellants in both cases and may I reserve five minutes for the rebuttal? James Schnetzel Granted. James Schnetzel So when a company comes into Pennsylvania intentionally and violates the rights of Pennsylvanians here, Pennsylvania courts have jurisdiction to hear the claims about those violations occurring within the borders of the these two defendants both came here intentionally, systematic continuous conduct within the forum and the claims here are only about what they did here, wiretapping. They sent devices onto the computers of Pennsylvanians. From there, they intercepted the Pennsylvanians' communications. James Schnetzel I don't want to divert the discussion here, which really gets into a merits discussion. What we're talking about is jurisdiction. I'd interested at some point to really understand how what occurred here was wiretapping as I've understood that and I am in an earlier part of my life was very familiar with Pennsylvania's act because I used it for criminal prosecution purposes. Putting that aside, that was an older piece of technology. I am admittedly a dedicated Luddite. I can use all the help that I can get by understanding just how the session replay code that is front and center, in this case,  Travis Thurston Sure. So our plaintiffs are website visitors. So there's two websites that issue, Papa John's website and Mattress Firm's website. So those plaintiffs intended to be on those websites and communicate with those websites in various ways. Anytime you're on a computer, there's basically two ways you can communicate. You can move your mouse and click stuff or you can type things in. So the way this software works is once you log on to a site or you call up a site, that site will send a piece of code onto your browser. So if it's Google Chrome, Internet Explorer, Firefox, any of those things, it then instructs your browser that anytime you start moving your mouse, clicking anything, you type any letter, a copy of that gets sent to a third party. Travis Thurston And the copy is the replay aspect of this or the ability to replay what the person has seen on his screen as he has used his cursor to go through the website. Matt Thurston Yeah. So the purpose of the code is to allow an eventual replay of the session, the visit to the web page. So what's done is literally in microseconds, they're called event data. So you're doing something that's an event. If it's a mouse movement, it's literally it will track the coordinates on your screen and it's sending those instantaneously to the third party. Travis Thurston So can we just, a lot's already happening there in terms of the tech. So you say that whenever a party goes to a website, the plaintiffs in this case, your clients were in Pennsylvania. Do we know where this website in the ether was? Do we know what server it was on? Do we know was it in Pennsylvania? We don't have any allegations of that, right? Matt Thurston It could have been in Virginia, it could have been in West Virginia, it could have been somewhere else. Travis Thurston Yeah. The servers that host the website, they could be anywhere. They could be distributed among a whole bunch of different servers. But this court has already addressed this particular aspect of where the interception is happening with similar technology in the Popa v. Harriet Carter case. And- Matt Thurston Sorry, I don't want- Travis Thurston Go ahead. Matt Thurston Oh, I guess my other question is, this interface, you said it happens in microseconds, but doesn't it also happen in stages in microseconds? Maybe there's one packet that goes back and it lets full story know that the person clicking on this might be based in Pennsylvania. Does that happen early? Do they get that information in a discrete period of time so that they know, aha, every other packet we get is from a person in Pennsylvania? Or are these just lumped together as far as the information, just get it all at once? Travis Thurston Yeah, the interception is continuous during the visit. But in any website visit, there will also be a communication of things like an IP address, the URL header, which is the address of the page that you're building. All of that is also collected by the session replay code. And if it's the URL, for instance, it would be sent to full story as soon as you land on that URL. Matt Thurston So I guess my question is, you know, some of this comes down to Calder and Calder part three. And do you think- Travis Thurston Actually, I disagree. It's very easy to resolve this case under Ford, Motor and Keaton. There's two main factors. Michael Svoboda That was my first question was, are you arguing and let's start with the basics. This is a specific  Travis Thurston Correct. Michael Svoboda And is it your argument that we could find personal jurisdiction here purely on purposeful availment under Ford Motor without a finding of express aim? Travis Thurston Yes, because they are doing this intentionally. They know they're doing it. They could voluntarily extract themselves from the situation if they wanted to. And the claim arises out of what they knowingly did. Michael Svoboda Those are all facts, though, that you've cited that might indicate why it would be just for us to do that. I have a threshold question. How do we get around our precedents? Travis Thurston Well, I think the- Michael Svoboda Haven't our precedents made clear that the Calder effects test has to apply? Travis Thurston No, even in Hedby Facebook, which I believe both Judge Phipps and Judge Hardiman, you were on that panel, you went straight into Ford Motor, and that was a misappropriation. Michael Svoboda All right, so the district court was flat out wrong when he stated that the traditional test outlined in O'Connor, in the words of the district court, really doesn't apply. He was wrong? Travis Thurston Yes. And Keaton is another example. Just because it's an intentional tort doesn't mean you only use the Calder analysis. The Calder test is an optional way to analyze the defendant's context with the form, particularly when the defendant is not actually operating- Michael Svoboda So Calder does not become the operative test when we're talking about or confronted with an intentional tort? Travis Thurston It can be. It all depends. So I think the way-  It can be, it all depends. Travis Thurston Yeah. Michael Svoboda There is a real helpful response. Travis Thurston It really does all depend. Michael Svoboda Sounds like it all depends if it should win the case. Travis Thurston Well, and actually, from the plaintiff's perspective, yes, the Calder test is useful when the defendant is not purposefully veiling itself with the form in a regular way. And Keaton illustrates that. Michael Svoboda There's a bunch of tests. There's a bunch of ways you can get personal jurisdiction. Tagged jurisdiction is one of them. With a tagged jurisdiction, we don't also say you can't avail yourself a personal jurisdiction, a purposeful availment. You can do these other things. So what you're saying is that Calder is a test. It's available in the circumstance where there's an allegation of intentional tort. Tagged jurisdiction is a way to get jurisdiction. It's available when someone's in the jurisdiction. Travis Thurston  Michael Svoboda The fact that there's a subspecies doesn't mean that the broad test still doesn't apply. Travis Thurston Exactly. Michael Svoboda Exactly. And just following Ford and Keaton, it's very simple. Are they here on purpose? Do they know they're here? And is the claim about what they do here? That said, it's very simple. And Calder, you'll see cases... Travis Thurston So what are the minimum contacts though? Because if you want to say Ford over Calder, what are the minimum contacts that they have? It seems they're different. It seems it's a much stronger case for Papa John's than you do for Full Story itself. Papa John's has some degree of brick and mortar. People are coming here to order a pizza for delivery in Pennsylvania. But just start with Full Story. What exact minimum contacts do they have? Michael Svoboda They're equally strong contacts because Full Story is literally they're tapping the market for that data in Pennsylvania. Travis Thurston That's part of what I hope we would get into before we got diverted. When I asked you at the outset to explain how this works, I had hoped that your explanation would continue into just what Full Story does. What happens when this information, this data reaches Full Story, and how does it reach Full Story? So the code itself that's operating on the person's browser in Pennsylvania tells the browser to send these packets of data to Full Story servers. Once they're there, Full Story uses its proprietary dressing up product to sell it back to Papa John's or mattress firms so they can see exactly how people were using the website. So they are profiting off of showing these website operators what Pennsylvanians are doing beyond what the website operator would normally even be able to see. That's the- Michael Svoboda Yeah, so the value added is that Papa John's pays Full Story for information like, this person doesn't seem to be paying any attention to pizzas, but is interested in calzones. Travis Thurston Exactly. That's a good choice, actually. Michael Svoboda So but- Travis Thurston I don't know if Papa John's sells calzones, but is that- Michael Svoboda The point is, the point is, it's giving the client, Full Story is giving the client discrete information about the browsing habits of the customer or putative customer. Michael Svoboda Yes, and they are making- Travis Thurston You've said it's enough to be a putative customer. It doesn't even matter whether- Michael Svoboda Actually, I think- Travis Thurston The pizza is purchased- Michael Svoboda They're most interested in the people that don't go through and finish a sale because the operator- Michael Svoboda Exactly. And so this product gives them that insight. So Full Story's contact- Travis Thurston But how is this any different? I mean, this is just electronic communications. How is this any different than if Full Story makes a call, doesn't have any contact at all with Pennsylvania? They make a call and they say, hi, you know, why didn't you order a pizza from Papa John's? They get that info and then they send that back to Papa John's. You could say, what minimum contact did Full Story have for doing that? Michael Svoboda That is a call. That's a contact. That is a contact. And as far back as- Travis Thurston A call is a contact? Michael Svoboda As far back as Burger King, the Supreme Court recognized, this is, I think, 84, that with emerging technology, companies can do business and tap into a market in a form without having literal boots on the ground. There's a lot of commerce that is conducted electronically through the wires. And those are contacts. And we've had 30 years of cases that analyze websites, telephone calls, TCPA cases always involve that type of thing, a call into the- Travis Thurston What if we said it wasn't enough? Michael Svoboda Sometimes we say it is enough. But in this case, both of these defendants are very systematically and purposefully here. That's the difference. Travis Thurston I thought you said we don't know where the servers are. They're purposely nowhere. Michael Svoboda And doesn't it matter that they're passive? Ford Motor opinion emphasized pretty- Justice Kagan's opinion for the court emphasized pretty heavily that Ford Motor was selling cars in Montana, in Minnesota, was advertising there, was doing repair work there, et cetera, et cetera. You know, it sounds like you're saying that for internet companies, it doesn't matter. The passivity of the internet company doesn't matter. Travis Thurston The point of departure here is passivity. This is actively wiretapping in Pennsylvania. Michael Svoboda Well- Travis Thurston That's a big difference, the reach into the forum. Michael Svoboda I think it's clear they're active. Maybe your friend on the other side will disagree with me, but I think it's clear that they're actively gathering data. But the only way they begin to gather the data is if people like your clients go to them. That's why you use the word passivity. They are sitting there in the ether and people are going to them. And if we rule in your favor, doesn't it mean that any internet company is amenable to specific jurisdiction in all 50 states? Travis Thurston Only if they're receptive, they want to do that. Walmart stores are passively sitting there waiting for people to walk in and make a purchase. So the fact that the plaintiff might have stepped in first, that's not an important factor. And that's the error the district court made. It attributed all of these contacts to the plaintiff's own choices. I think the better question is, would the defendant still be doing this and still be wiretapping in Pennsylvania, if not for these two specific plaintiffs? Michael Svoboda Did you actually answer Judge Hardiman's question? I may have- Travis Thurston I think I answered by saying- Michael Svoboda My line of this question was, well, then, aren't we looking at personal jurisdiction in all 50 states? Travis Thurston No, they can restrain their wiretapping. They don't have to do this in every state. They chose to do this in every state. Michael Svoboda At any point in time, so I guess, to me, your case gets a lot stronger. If you could say, Full Story knew that its code would be used by Pennsylvanians. They knew that as soon as one of their clients was on their website, that they knew through some degree of packeted information that they were interfacing with a person from Pennsylvania. Much like when you call, you might know from the area code exactly where you've landed. If they know that, it's stronger because you say, we aren't just dealing with any internet company. We're dealing with one that actually interfaced and extracted data from Pennsylvania. But unless they knew that, then it feels like the questions from my colleagues really, really get to be a big deal. Travis Thurston We allege they didn't know that. And we allege that one thing that Full Story offers to its clients is the ability to filter the session visits by people who came from Pennsylvania. They advertise and market that to a high degree of accuracy to the county level, they can show where people were coming from. Those allegations are all here. But with my time's up, I'm happy to continue or sit down and come back for rebuttal. Mark Mosier All right. Thank you, Mr. Edsel. Mr. Mosier. Mark Mosier Good morning, your honors. May it please the court, Mark Mosier on behalf of the appellees. I'd like to start by addressing the standard and the interplay between CalDER and the traditional test. And then I want to make sure I spend some time talking about the Ninth Circuit's decision in Briskin, which I think resolves all of the issues presented here. And I'd like to see how the court could reverse in either decision here without creating a certain split with Briskin. But we start with the CalDER versus traditional test. In both IMO and in REMIC, this court said that it applies the CalDER effects test to... Mark Mosier Mr. Edsel said, yeah, but we didn't say anything about it in HEP. What's your response to that? I said we went straight to Ford Motor and HEP. Mark Mosier It's not clear that it had anyone argue that what was at issue there were intentional torts. And what the court said in REMIC, it recognized that they're not intentional torts at issue. You apply the traditional test. I think ultimately, we win under both tests and why there's such a focusable availment test is that they're pushing for an extremely broad reading of Ford. And that reading of Ford is not relevant or available to them under CalDER. Because what CalDER says is that the relevant contacts for purposes of establishing personal jurisdiction over an intentional tort is a tortious conduct. And what they're trying to do is to bring in brick and mortar stores, contracts with other companies that they say are relevant under Ford, but wouldn't be under CalDER. But we think even if you look at Ford, especially if you look at this court's application of Ford at HEP, if you look at the court's application of both HEP and Ford in Martinez, if you look at the Ninth Circuit's application of Ford in Brisbane, the Fifth Circuit in Johnson v. Huffington Post, all of those courts recognize that the arising out of and relating to part of the traditional test still is a meaningful limitation. And HEP, the court still requires a strong connection. And what the courts have looked at is the nature of the claim the plaintiff is asserting, the nature of the injury that the plaintiff is alleging, and does the contact that the plaintiff is relying on, is that related to that injury? So do you think there is contact? Do you think there are minimum contacts in these cases with Pennsylvania? Because you're going to do that triangle balancing, right? One way is to say there's no vertex there. There's no contact. Right. There are a lot of contacts floating around. We have the one in the argument that they rely on a lot that the websites purposely reach into the state to extract data. On that, we say there's no express aiming. That is not a relevant contact. For a brick-and-mortar store, that would be purposeful availment. And sure, if there's a slip-and-fall claim or if there's an very different case. So for those, like a brick-and-mortar contact, there the argument is it's not related to. And there it looks a lot like that. So are you using Calder Prompt 3 express aiming to prove or establish minimum contacts? We're using, under Calder Part 3, what it says is the tortious conduct has to be expressly aimed. So the things like the brick-and-mortar store is not part of the tortious conduct. The tortious conduct is the delivery of the code into the form. And for that, we're saying there's no express aiming. So under Calder, the only potential. There's express invitation. Could we say that? No. I mean, your clients know that people in all 50 states are likely to visit the website. Right. And that the data is going to be grabbed. Right. It seems naive to suggest that your clients would be surprised that people in Pennsylvania would be subjecting themselves to the session replay code. You'd concede that, wouldn't you? We're not challenging that. The knowledge is a separate aspect of the Calder test. So then the whole case seems to come down to whether somebody is active or passive. If you make yourself available for people in all 50 states to come, the argument is that that doesn't subject one to personal jurisdiction, specific personal jurisdiction. But if you actively go there like Ford Motor, then you are subject to it. And what the courts have uniformly said is when the potential, the relevant contact we're looking at is publishing of a website and making a website generally accessible, that alone is not enough to establish either purposeful direction for full available, express aiming of every, of all 50 states. Okay. But their argument's a little better than that. They're not just saying you can come to our website and we're passive and we're sitting here. Their argument is that once they get you to come, they're coming back and they return the favor by gathering all the data in Pennsylvania. Are they wrong about that? They are wrong about it. That's precisely the argument that was rejected. Is it your argument that yes, we're gathering the data, but we're not gathering it in Pennsylvania. We're gathering it wherever in the world the servers might be located. Are the primary argument for purposes of purposeful, for personal jurisdiction, both express aiming and purposeful available, that the contact is in Pennsylvania because of the actions of the plaintiff, because the plaintiff- I grant you that. Plaintiff's initiating. So it's the plaintiff's quote fault that all this happens. But we're talking about the response and there is a response. Is your argument that there's no response? I'm mistaken about that. Or is your argument there is a response, but the response isn't in Pennsylvania. It's in the ether, wherever the servers are located. Our response is that for purposes of purpose, for personal jurisdiction, it is not enough to respond to a request from the forum. That the defendant has to That was clearly relevant in Walden. All right. I'm sorry to jump in, but this is so granular for me anyway. It sounds like you're saying that purposeful availment has to be initiated. And it can't be a response. And I'm not sure I agree with that, if that's your argument. Can't one- can't one- a vendor- here, full story, Papa John's- can't a vendor purposefully purposefully avail itself of a jurisdiction by responding to what somebody else does? In some context, but the courts have informally held that it won't apply that analysis to website and to a visitor to a website because- Is this really just a visit to a website because it's an extraction of the information on the website? In those cases, at least, at least from my understanding, don't involve extraction. They just involve, Hi, I was there. I made some clicks. Not, we recorded all of it. You know, thanks for coming. We recorded all of it. We sent it off, out of state. And you can't touch us unless you come to our state to get us. So Brisket squarely resolved that. And what Judge Bress said, he started and looked at the website cases and the uniform body of cases that says there's not personal jurisdiction in all 50 states just because you visit a website. And what Judge Bress said is you recognize this is sort of a novel situation because there was Shopify that had their code embedded on the website to extract and collect data there. There were privacy claims saying, I knew I was on the website, but I didn't know that on the back end, Shopify had its code embedded. It was collecting all my information and what Judge Bress and the ninth circuit concluded there is the same framework applies and there's no meaningful difference between challenging the visit to the website and challenging third party code embedded on the website. A lot of the same considerations are at play. If you held otherwise, it would mean that by publishing onto the internet, a backend processing platform, you would subject yourself to jurisdiction in all 50 states. It's also just recognizes the reality of the allegation is, and it's correct. This just JavaScript code embedded in the website. There's no real meaningful difference between the code that runs the website and the code that runs, that collects the data for session replay. It's all put in the same file that sits on the server somewhere and waits there until somebody types, Papa juggles.com into their browser, makes a request to the server. All of the code is returned to their server and the same. So to try to disaggregate the code say, well, the code that runs the website, there's no express aiming and purposeful direction there, but the other JavaScript that's sending information to a different server is you just articulated the line. The line is a functional one. Some of the code functions just to keep your website up and running. Some of it serves to distract. Why isn't that functional line of meaningful division? Because it's received in the same way, in the same request, and it is all one request. It doesn't end up in the same space though, right? I mean, some of the data goes to full story. Some of the data is fully recorded. Some of the data just isn't. So doesn't that, I mean, personal transcription really looks at function. Why isn't that functional difference really critical? It looks at the function of what the defendant is doing to reach into the form and whether or not they're doing. And both the website itself in its entirety, the website itself and the session replay code sent to the browser only in response to a single request to visit a website. And that's why I think the Ninth Circuit was correct to say, if we don't treat differently the backend code from the rest of the website, you still could establish express aiming over code. If you showed something, what the courts have said, you need something more, right? Something more than just generally accessible in every state. What would the something more be? If code was designed to only collect data from people in Pennsylvania, that would be... What if the code told the data collector very early on that this data is coming from a person in a county in Pennsylvania, and then it continued to collect data after that, would that be good enough? No, it's obviously relevant, but it's not dispositive that both the test from Calder and Walden makes clear to just the fact that, you know, the residents of the defendant know that you may cause harm. But doesn't it become a lot closer to express aiming into the forum state when you know that the person's in the forum state, and then you continue to want the data and to record the data of the person in the forum state? That's a lot closer to express aiming because it's not just, we sent out into the ether, come what may. Okay, we got their IP address. We know the county that's in, and we're going to keep it up. That feels a lot like you're aiming. If that's not aiming, then maybe they shouldn't charge for their product because that data matters. No, I mean, it's certainly relevant to the court. The cases are clear. It's not dispositive. And adopting that line in a large way would effectively overrule the general principle that by putting a website onto the internet, you're not purposefully availing yourself of every jurisdiction. Because any website of any size, and your hope, if you put a website on the internet, you want people from all 50 states to come there. If it's a large business, you're going to know, you're going to get visitors from all 50 states. And so the question is, is the website targeted or designed? And what the cases have said is, is there something about the website that is than everywhere else? And when some websites have been... So, I mean, again, it isn't a difference between the website and the particular piece of code. If the website doesn't have the code that commits the intentional tort, then everything you say seems to make sense. But once you put the code on, and once you say, we know exactly where you are, and now we're going to allegedly, and it's just an allegation at this point, violate the some notion of aiming. I mean, the website is code, right? I guess I would have kind of pushed back on that, that a website is nothing. It requires the same sort of code that perform different functions. Right. And it's all in the same file. If you change what code is on there, and you can change, you know, how much data you want to give the website, how much data they want to use too. Right. But I think we think the Ninth Circuit had it right when it said, you have a file sitting on a server that has a lot of code, right? And that code is used to generate the website. If the person using their phone or their computer goes to a browser, types in the web address, which makes a request for all of the code to run the website, and that's sent to their phone, it's clear from the law that all of the code that is used to generate the website, there has not been express aiming or purposeful direction. And what the Ninth Circuit said, and we agree with this, there's no basis, the law to treat the lines of code for the session replay code differently as to whether or not that code constitutes purposeful availment or express aiming by the defendant. Would it be purposeful availment if the session replay code followed up with all clickers who they thought were prospects to spend more than $100 with the vendor? Followed up as in like sending an email? Followed up by sending an email to the clicker. That would, that would be a much closer case. And the reason I don't have a clear answer is a lot of times they'll say like one, one particular phone call or one particular email may not be enough to avail yourself, but, but certainly, certainly if there are numerous that could give rise to purposeful availment, but that's would be a different contact, right? Like the contact wouldn't be based on a visit to the website. It would be, we would get into the cases where there were phone calls made, there were emails sent. And at what point is it, or is it a sufficient contact to, to give rise to personal jurisdiction? But then, you know, we'd also then have to get in, especially here, and I want to kind of come back to a lot of that is, is the relatedness test, right? Their claim, it's so focused on the visit to the website, right? And that's why the- Well, I'm not sure that's giving them enough credit. They're focused on what happened during the visit to the website. And they're saying that's where the activity is occurring. That's where the meaningful activity is occurring. The full story is, has the business model on it. Right. Yeah, no, no, that's, and that is the entirety of their claim. And so, and I guess I was making the point of when they start talking about brick and mortar sales, contracts. Yeah. I mean, I think, I think the pizza sales are irrelevant because nobody's claiming that they got sick by eating a pizza, but they are claiming that their privacy rights were violated contrary to Pennsylvania law by the data scraping that occurred. Right. And what we say is that the reason that any of the code came onto their browser is because they reached out and requested it by visiting the website. Well, that gets me back to what I was haranguing you about before, that it sounded like you're saying that because he started it, we can't be subject to jurisdiction there. And I'm not sure that's true because while the plaintiffs here put, put things in motion by going to these web, the mattress firm and Papa John's websites the session replay code responded. And what I'm trying to understand is what we're all trying to understand is what's the nature of that response. What are the details of that response? Well, what does that response have to do with Pennsylvania? And, and I assume your argument isn't, well, it's got a lot to do with Pennsylvania, but forget it because they started it. No. And the, right. And the point I'm trying to make is all of the cases that say a website is not subject to jurisdiction in all 50 States, based on the in every one of those instances, when the plaintiff visits the website, the website operator responds by sending the information into the forum. And what the courts have uniformly held is treat that as under Walden in that line of cases of saying that is the conduct of the plaintiff that initiated that contact. At least, you know, you referenced the Spotify decision from the ninth circuit and it recognizes we have to draw lines, but as I understood the main line that it was drawing there was it said, okay, websites present a bunch of problems for us in terms of personal jurisdiction. One of the key axes that we're looking at is does the website have a forum specific focus? I think that that might be a quote, but a forum specific focus, if it does, then, then we're pretty far down the line. I'm at least for express for, for intentional purposes of having personal interest. Let me just ask you this. Do you think there's any part of false stories code that has a forum specific focus for targeting Pennsylvania? No, I do not. And there's none alleged here. I think if anything, they allege that the code operates the same way for everyone anywhere, regardless of where they're visiting from. And so it initially does, and then it finds out that you are from Pennsylvania. And then after that, it applies your code to notice your clicks in, in, in, in types. Once it finds out that you are from Pennsylvania and continues to run the remainder of its code, are you saying that that's not express aiming and that code isn't express aiming? Because if you would have clicked and said, you're from Ohio, it would have run that same code. And therefore the fact that you know, along the way that is now Pennsylvania means nothing. It's not that it means nothing. It means there's separate elements and it is clear. We think from the case law that the knowledge of where a plaintiff is located is not by itself sufficient to establish express aiming. And so the answer is yes, that's still no express aiming, even if they learn where the person is located, because there's no allegation that the code operate any differently based on that information and based on where they're located. If I could say one more thing about your, your mention of a risk in there, if anything, facts had a closer connection to California because the website with the Shopify code embedded in it, it was clear that was a merchant. You had a California user visiting a California website, making a purchase in California, still no personal jurisdiction over the backend processor because the backend processor had not done anything to avail itself of California. That's true. Even though it had 80,000 like customers in California, it had brick and mortar operations. It had a distribution center. None of those were relevant under four and nothing about its code differentiated between California and every other state in the country. When you say nothing about its code, you know, sometimes we make a website purchase and we'll add like sales or stacks or something like this, that might vary based on state. I assume that that variation is part of the code. Yes, but that if it's the same in every state and the fourth circuit of the fidgets versus Marriott kind of addressed a similar argument there for you could, there was a drop down box. You could choose your state. And when you chose your state, you saw the Marriott hotels in the state. They said that wasn't good enough to establish personal jurisdiction because again, it worked the same way for all 50 states. It wasn't targeted at South Carolina any differently than it was California, just based on your choice of which state to pick. I see my time is up. Where could, and should these cases have been brought? Both of these defendants are subject to jurisdiction in Delaware and either plaintiff would even have to leave this circuit to bring these cases. No other questions. Okay. Thank you, Mr. Moser. Let's hear Mr. Edsel's rebuttal. Thank you. There's a, there's a danger in over-relying on the express aiming prom of Well, let me, let me jump in there on that. You, you've, you really resisted the application of the Calder effects test. I assume because you, you're going to lose if we apply it. This, this is actually, I'm just about to address why, why I've resisted. Okay. You cannot take the words express aiming to mean a national defendant that is purposely in every state can't be called into those states for what it's doing there because it's not differentially targeting one state over the other. And that's their argument. They're saying we do this all over the country. So we're not doing it in Pennsylvania, but that doesn't make any sense. This case about wiretapping Pennsylvania, making yourself available to customers on the internet and all 50 States. Isn't the same as expressly aiming at all 50 States. Is it? Well, they're, they're not just making themselves available. We're our claims here about wiretapping in Pennsylvania, not just the, they didn't approach your client. Well, your clients approach that. And the, the, that's why you weren't available. Well, yeah. Ford didn't sell the cars to the plaintiffs in the Ford motor case. They sold them to other people. The cars made their way to the States later. Correct. But, but the, the opinion of justice Kagan says that the cars were maintained there. The cars were sold there, not those particular cars, but Ford Ford was doing a tremendous amount of proactive selling and repairing in the subject States. Right. And it was doing that same thing in every other state in the union. And so that's, that's the danger with quarters. If you over-rely on this notion of express aiming, then you lose sight. Well, but the, well, the accidents occurred in Minnesota, Montana, I guess your argument is, well, the wiretapping crime occurred in Pennsylvania. Yes, exactly. And that's why you have to be careful with Calder. There's two other cases that my friend mentioned Walden. Walden is sort of the source of some of these problems because they say, well, the residents of the plaintiff can't be an important fact. That case is about an incident that happened in Georgia. Somebody's money was taken from the airport by a police officer. They tried to sue this police officer in Nevada. So that case is not about what the defendant did in the form that defendant never purposely availed itself of Nevada in any way, totally different situations. Could you make the same claims you've made in this case and sue in Delaware? I think it would only be proper if we had a plaintiff who suffered the injury in Delaware and sued about what happened in Delaware. That, that would be the best way to do it because the cases about what happened here in Pennsylvania, we're limited here to a claim about Weska statute only as it, as they violated it as Pennsylvania. So this is the most natural place for this case to be. It's about what they did voluntarily. They knew they were doing it. And that checks all the boxes. If you, if you go back to Ford, you go to Keaton, you go to any of the Supreme Court's big cases, they're looking at, did the defendant know it was doing it in the form? Could it have extracted itself from that situation if it wanted to? And that's it. That's it is the claim about what happened in the form. And it is. But a Delaware resident who gets on her laptop in Philadelphia, she could sue in Delaware, right? Not under specific jurisdiction. I don't think so. Because that wiretapping occurred in Pennsylvania. So you need the three legs, you need the plaintiff, the defendant, and the claim to all come together in the form. We have that here. We have the plaintiff, you know, at home in Pennsylvania. We have the defendant purposely doing business here. And then we have the claim, the wiretapping here. That's all three prompts and they all unite in the form. And what was the conduct that was expressly aimed by Full Story and Papa John's? The wiretapping that they plan to do to get this data from Pennsylvanians. They say that was aimed everywhere. So what you're telling us is everywhere aiming can be a form specific folks? Everywhere aiming on purpose means you have chosen to go into those markets. You've chosen to avail yourself of those forms. And you might be right about that. But doesn't that mean that online companies are subject to specific personal jurisdiction in all 50 states? Only if they are actively doing something to the plaintiff the way that these defendants were. Not just by having a billboard type website that you can just look at. But by your theory though, the code is actively doing something. You're saying the code is a device. Yes, exactly. But Mr. Moser explained that the entire website is code. So what's the difference between putting up a website and scraping data? The level of interactivity is relevant. We have the Zippo test developed in the West. Does it just go to liability though, not jurisdiction? No, Zippo is all about analyzing how website contacts with the jurisdiction. There's been, like I said, 30 years of cases where they look at how does the website interact with the form? How interactive is it? This is at the most extreme end of hyper interactivity because the claim is literally about what the website code does to people on their computers while they're sitting in the forum. We have all the ingredients here. Pennsylvania is the natural form. All right. Thank you, Mr. Edsel. We thank both counsel for the very helpful briefing and arguments. We'll take the matter under advice.